# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CHRISTOPHER DEON GATTIS,           )
                                   )
                Petitioner,        )
                                   )
        v.                         )        1:06CV598
                                   )
SUPERINTENDENT LAWRENCE SOLOMEN,   )
                                   )
                Respondent.        )

### MEMORANDUM OPINION AND ORDER

**Eliason, Magistrate Judge**

Petitioner, a prisoner of the State of North Carolina, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner was tried in the Superior Court of Alamance County for capital murder and other charges based on his killing of his estranged wife. He was convicted by a jury of first-degree murder (based on premeditation and deliberation and felony murder), first-degree burglary, and misdemeanor assault with a deadly weapon in cases 01 CRS 5582-84. The jury recommended life imprisonment on the first-degree murder conviction. Petitioner was then sentenced to life imprisonment without parole for the murder conviction, with consecutive sentences of 103-133 months of imprisonment and 150 days of imprisonment on the burglary and assault convictions.

Petitioner unsuccessfully pursued both a direct appeal and collateral relief in the state courts before filing the current petition. Petitioner now sets out ten claims for relief. Respondent has filed a motion for summary judgment. (Docket No. 6.) The case is before the Court on that motion.

## Facts

The facts, as shown by Respondent's evidence at trial and set out in the North Carolina Court of Appeal's denial of Petitioner's direct appeal, are as follows. <u>State v. Gattis</u>, 166 N.C. App. 1, 601 S.E.2d 205 (2004). Petitioner and his wife, Charlotte Gattis, were living separately after marital discord. Ms. Gattis lived in an apartment with her daughter from a previous marriage and had begun dating a man named Jason Stover. On March 23, 2001, Ms. Gattis and Stover were at her apartment watching television, while Gattis's daughter was at another person's house. They heard a noise like a key on glass and Stover investigated. He saw a person standing outside the patio doors of the apartment. Ms. Gattis recognized the person as being Petitioner, called 911, and told Petitioner that she was doing so. Petitioner responded by demanding that she open the door.

Soon after, Petitioner pressed on the door. It opened and he fell into the kitchen. He was holding a handgun, which he and Stover began to wrestle over. Petitioner was eventually able to get the gun and point it at Stover, who ran outside. As Stover ran away, he heard Petitioner yell that he was going to die and then heard a gunshot. This shot apparently missed everyone. As it turned out, Petitioner's gun did not have a magazine and had to be hand-loaded one bullet at a time. Petitioner reloaded his gun and then began to struggle with Ms. Gattis. He eventually placed her in a headlock using his left arm.

-2-

During this time, the tape from the 911 call recorded Ms. Gattis repeatedly asking where her daughter was, telling Petitioner that she did not want him to go to jail, and begging him not to kill her. A male voice later identified as Petitioner was heard more than once threatening to kill her. The tape then recorded the sound of a second shot and Ms. Gattis's screaming stopped.

Investigators discovered that the second shot was fired into the right side of Ms. Gattis's face from a distance of half an inch or less. It passed through her head, killing her and apparently also passing through Petitioner's left arm as it exited. Petitioner fled the apartment and went to a telephone booth. He first called Ms. Gattis's mother and told her that he had shot and killed Ms. Gattis and that he was sorry. He then called Jeanette Florence, his son's mother, to pick him up and drive him to the hospital. He told her that Ms. Gattis had been shot and that he had been shot and was bleeding badly. He said that he and Ms. Gattis had been "getting into it" when the gun went off and shot them both. He repeated this assertion on the way to the hospital, but provided no details.

Upon his arrival at the hospital, Petitioner told police that he was the one they were looking for. He was then treated for his wounds. Petitioner also made several other statements. He told a physician that he got into an altercation with his wife and that the gun went off. This statement was overheard by a police officer. Petitioner also told a nurse that he argued with his spouse and was wrestling over a gun that accidentally went off.

-3-

Finally, he told police the next day that he went to Ms. Gattis's to see if she was with another man. He intended to break into the apartment with a screwdriver, but allegedly found the patio door unlocked. He slid it open, returned to his car, retrieved his gun and loaded it. He admitted to struggling with Stover before firing at Stover as he ran. He also admitted to reloading the gun and struggling with Ms. Gattis. He claimed that he had her head under his left arm with the gun about a foot from her head and that her hand was on the gun when it went off and she fell to the ground.

## Petitioner's Claims

Petitioner's first claim is that he received ineffective assistance of counsel because his trial counsel failed to object when he was sentenced in the aggravated range for a criminal record level of V. He claims that his actual record level was III and that the aggravated range should not have been used. Petitioner's second claim is that his attorneys failed to make out a prima facie case to show that the prosecution improperly struck four black jurors from the jury panel while seating similar white jurors. Next, Petitioner argues that the trial court erred by refusing to admit statements he made while in the hospital following his killing of his wife.

Petitioner's fourth claim for relief complains that his attorneys essentially conceded his guilt by eliciting testimony from Claudia Smith concerning what Petitioner told her on the telephone following the killing and by saying that Petitioner had done something wrong and that he had shot himself in the left arm.

-4-

His fifth claim challenges certain statements made by the prosecutor during the opening and closing arguments as being "abusive" and improper. In his sixth claim, Petitioner returns to the performance of his trial attorneys and argues that they erred by failing to move to suppress certain statements made by Petitioner following his arrest. Petitioner's seventh claim is generally confusing. He states in the initial claim that the trial court erred by allowing the introduction of hearsay evidence against a non-testifying defendant and the introduction of a prior conviction more than 10 years old. However, in the facts supporting the claim, Petitioner complains that he did not get an evidentiary hearing on the issue of whether his appellate counsel failed to properly perfect his appeal because pages of the transcript containing hearsay testimony were excluded. He states that he seeks a proper appeal, but then makes further statements about the admission of hearsay testimony and his record at trial.

Petitioner's eighth claim for relief alleges that his attorneys were ineffective for not seeking funds to retain an expert witness who could have testified that the victim contributed to the firing of the gun that killed her. His ninth claim asserts that counsel failed him by not "conducting a voir dire of the 911 tape recording outside the presence of the jury," hiring an expert to testify about places on the tape where a male voice could not be understood, scrutinizing it for technical problems or tampering, or objecting to its admission. Petitioner's tenth and final claim

-5-

states that his indictment was defective, resulting in a lack of jurisdiction in his case.

## Standard of Review

If the Court finds that Petitioner's claims were adjudicated by the state courts on their merits, it must then apply 28 U.S.C. § 2254(d)'s highly deferential standard of review to Petitioner's claims. That statute states that habeas relief cannot be granted in cases where a state court has considered a claim on its merits unless the decision was contrary to or involved an unreasonable application of clearly established federal law as set out by the United States Supreme Court or the state court decision was based on an unreasonable determination of the facts. A state court decision is "contrary to" Supreme Court precedent if it either arrives at "a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that of the Supreme Court. Williams v. Taylor, 529 U.S. 362 (2000). A state decision "involves an unreasonable application" of Supreme Court law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 405-406. "Unreasonable" is not the same as "incorrect" or "erroneous" and the reasonableness of the state court's decision must be judged from an objective, rather than subjective, standpoint. Id. at 409-411. A holding is not reasonable simply because precedent written

-6-

by one of the Nation's jurists agrees with it.  Id. at 410.  As for questions of fact, state court findings of fact are presumed correct unless rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Here, Petitioner states that all of his claims have been presented to the state courts.  Therefore, the standards just discussed do apply.  To the extent that Petitioner may be incorrect as to some, or some parts of, his claims, the Court notes that the result is the same no matter what standards are applied.

## Discussion

### Claim One

Petitioner's first claim can be dealt with easily.  Petitioner alleges that he was erroneously sentenced for his burglary conviction in the aggravated range for a person with a Level V criminal history when he should have been sentenced in the presumptive range for a person with a Level III criminal history. Petitioner's underlying contention, that he was sentenced in the Level V aggravated range, is incorrect.  The Judgment and Commitment entered against Petitioner for the burglary charge clearly reveals that Petitioner was sentenced, as he contends he should have been, in the presumptive range for a person with a Level III criminal history.  (Docket No. 7 Tab 1.)  This alone causes his claim to falter.

Further, even a basic review of North Carolina's felony sentencing statute also reveals that the Judgment and Commitment form is accurate.  Petitioner's burglary conviction was a Class D

-7-

felony.  N.C. Gen. Stat. § 14-52.  The range of minimum sentences for a defendant who is convicted of a Class D felony, has a Level III record, and is sentenced in the presumptive range is 82 to 103 months.  N.C. Gen. Stat. § 15A-1340.17(c).  Petitioner was given a minimum sentence of 103 months, which is within that range.  He was also given the appropriate corresponding maximum sentence of 133 months.  N.C. Gen. Stat. § 15A-1340.17(e)(maximum sentence for a person given a 103-month minimum sentence is 133 months).

In a supplement to his petition, Petitioner adds an allegation to his challenge to the burglary conviction.  He claims that the indictment in the case improperly omitted the hour of the alleged burglary.  While Respondent concedes that the hour of the burglary was not set out in the indictment, Respondent also correctly notes that this is not a required element of the offense of first-degree burglary in North Carolina.[1] State v. Wood, 286 N.C. 248, 254, 210 S.E.2d 52, 55 (1974).  The indictment needs only to allege, as Petitioner's did, that the burglary occurred during the night. Id.; (Docket No. 7 Tab 1.)  His first claim for relief fails and will be dismissed.

## Claim Two

Petitioner's second claim for relief alleges that his right to an impartial jury was violated by the prosecutor's use of four peremptory strikes to excuse African-American jurors and that his attorneys failed him by not making out a prima facie case to

---

[1]Respondent also correctly notes that the claim was not raised in state court and has been procedurally defaulted.  N.C. Gen. Stat. § 15A-1419.

challenge the strikes.  At the trial, Petitioner only objected to
the strike of the first black juror.  The prosecutor gave his
reason.  The court of appeals found no error.  <u>State v. Gattis</u>, 166
N.C. App. at 15, 601 S.E.2d at 214.

It is impermissible to exclude persons from a jury because of
their race.  <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  In order to
establish a claim under <u>Batson</u>, a defendant must first make a <u>prima
facie</u> showing "that the totality of the relevant facts gives rise
to an inference of discriminatory purpose" in the prosecution's use
of its peremptory challenges.  <u>Id.</u> at 94.  If a defendant does so,
the state must then give race neutral reasons for dismissing the
jurors.  Finally, the trial court must decide whether, based on all
of the evidence, the defendant has shown that discrimination
occurred.

Even accepting Petitioner's own allegations, he cannot
establish his claim.  In setting out his case, Petitioner makes
several comparisons between four black jurors who were excused by
the prosecution and five white jurors who were accepted by the
prosecution.  The first juror Petitioner points to is "Juror Mr.
Long" who was a 19-year-old, unemployed black man.  Petitioner
states that the prosecution's first peremptory strike was used to
remove Long.  When the defense attorney objected and noted a
general lack of black persons on the panel of potential jurors, the
trial judge stated that there was no pattern yet, but that he would
be vigilant.  The prosecutor added that Long was 19 and unemployed
and that teenagers normally did not vote for the death penalty.

-9-

Petitioner compares Long to David Pates, a 20-year-old white male who worked at a family business. His uncle was an officer with the North Carolina Highway Patrol who testified in Petitioner's case. Of course, while Long and Pates were close in age, the differences between them are clear. Pates was employed and Long was not. The prosecutor stated that he felt employment was significant. Perhaps more importantly, Pates was related to a law enforcement officer who was expected to testify in the trial.[2] It would have been all but foolish for the prosecution to have used a peremptory challenge on such a person. <u>See</u> n.1.

Petitioner next points to Cora Norman, a 55-year-old black female. Norman had once been charged with assault with a deadly weapon for assaulting someone who was "fooling around" with her husband. She was stricken by the prosecution. Petitioner compares her with Patricia Clapp, a 50-year-old white woman who stated that she did not feel that she could be impartial. Presumably, this was because she had been attacked by a stranger 15 years earlier and that she had experienced domestic violence while growing up. The prosecution did not move to have her stricken. Again, the prosecution's actions regarding Jurors Norman and Clapp are hardly surprising. Petitioner was accused of murdering his estranged wife after finding her with another man. It is natural that the prosecution would not want a person who was **accused** of a similar crime to be on the jury, but would accept a person who had been the

---

[2]Understandably, Pates was later excused by Petitioner through a peremptory challenge. (Trial Tr. at 1081.)

**victim** of similar crimes. There is no sign race played a part in the decision.

The third juror pair pointed out by Petitioner are Jane Watkin and Myra Abadie. Watkin was 49 years old, black, and revealed that her son was serving a 75-year prison sentence. (Trial Tr. at 969.) She was excused by the prosecution. Abadie was 50 years old, white, and stated that she left her husband after 30 years in an abusive relationship. She also had a son who had been charged as a juvenile. She was not excused by the prosecution. Again, the differences are stark. The long prison sentence given to Watkins' son might have made her sympathetic to an accused person, while the abuse suffered by Abadie would have tended to indicate that she might favor the prosecution in a domestic violence murder case. The juvenile charges her son had faced pale in comparison to the 75-year sentence received by Watkins' son. There is again no mystery, and no sign of racial discrimination, in the choice made by the prosecutor in striking Watkins and not Abadie.

Finally, Petitioner relies on Donald Beach, Joanne Barnwell, and Ralph Lee. Beach was black, 22 years old, and had once been charged with misdemeanor breaking and entering and possession of stolen property. Barnwell was white and 68 years old. Her mother had been raped 20 years before and Barnwell's home had been broken into and robbed. Lee was 31 years old, white, and had once been convicted of driving while impaired. Beach was removed by the prosecutor, while Barnwell and Lee were retained by him. Obviously, Barnwell is nothing like the other two jurors. Not only

-11-

is she much older, but she is another crime victim and not someone ever accused or convicted herself. Beach and Lee are perhaps more similar because both were young and had been accused of crimes. However, their crimes were different. Beach was accused of breaking and entering which is a crime of force and usurpation, as well as being one of the crimes of which Petitioner was accused. Lee, who was older, had only been convicted of driving while impaired, which does not involve those more criminal facets of Beach's charges, and is quite dissimilar from the charges Petitioner faced. As with the other jurors cited by Petitioner, Beach's dismissal in light of Lee's retention does not raise questions about a raced-based use of peremptory strikes by the prosecution.

Overall, Petitioner has failed to show any evidence that the prosecution in his case used strikes in a racially discriminatory manner. In fact, his descriptions of the jurors demonstrates that the prosecution generally struck jurors who would have presented reasons other than race to favor the defense while retaining jurors who had reasons other than race to favor the prosecution. Even if Long, who was stricken because he was young and unemployed, is compared with Lee, who was retained despite a DWI conviction, there is no basis for claiming race caused the difference. The prosecutor was quite clear he thought teenagers would have difficulty in voting for the death penalty. And, Long was unemployed. Lee, on the other hand, appeared more stable, being older and employed. The driving while impaired conviction does

-12-

nothing to detract from the more apparent stability and maturity desired by the prosecutor. The prosecution actually advanced race-neutral reasons (age and unemployment) for dismissing Long. Petitioner points to nothing that could have been used to overcome these reasons and prove that race was the real motivation for Long's dismissal.

Petitioner also claims that his attorneys provided ineffective assistance of counsel because they did not properly defend his <u>Batson</u> rights. An ineffective assistance of counsel claim is evaluated by using a two-part test:

> In order to establish an ineffective assistance of counsel claim . . . [a petitioner is] required to establish that his "counsel's representation fell below an objective standard of reasonableness," measured by the "prevailing professional norms," [<u>citing</u> <u>Strickland v.</u> <u>Washington</u>, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)], and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id</u>. at 694, 104 S.Ct. 2052. "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." <u>Id</u>. at 687, 104 S.Ct. 2052.

> In determining whether counsel's performance was deficient, "[i]t is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Id</u>. at 689, 104 S.Ct. 2052. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action might be considered sound trial strategy." <u>Id</u>. (internal quotation marks omitted).

> Similarly, in evaluating whether the defendant has shown actual prejudice from any such deficient performance, it is insufficient for the defendant "to

-13-

> show that the errors had some conceivable effect on the
> outcome of the proceeding," because "[v]irtually every
> act or omission of counsel would meet that test." Id. at
> 693, 104 S.Ct. 2052. Rather, a "reasonable probability"
> that the result would have been different requires "a
> probability sufficient to undermine confidence in the
> outcome." Id. at 694, 104 S.Ct. 2052. When challenging
> a conviction, "the question is whether there is a
> reasonable probability that, absent the errors, the
> factfinder would have had a reasonable doubt respecting
> guilt." Id. at 695, 104 S.Ct. 2052. And, "[w]hen a
> defendant challenges a death sentence . . ., the question
> is whether there is a reasonable probability that, absent
> the errors, the sentencer . . . would have concluded that
> the balance of aggravating and mitigating circumstances
> did not warrant death." Id.

Fisher v. Lee, 215 F.3d 438, 446-447 (4th Cir. 2000).

As has already been discussed, no violation of Petitioner's rights as described in Batson occurred and there was no viable ground for his attorneys to make an argument that one did. Therefore, they could not have provided him with ineffective assistance and prejudiced his case. Certainly, the state court's adjudication of Petitioner's Batson claims does not fall short of AEDPA's standards of review. Petitioner's second claim for relief fails and will be dismissed.[3]

## Claim Three

Petitioner's third claim involves several of the statements that he made just after his wife's death. Petitioner did not take the witness stand himself. Rather, he wanted other people to recount what he allegedly said. Thus, the statements were hearsay.

---

[3]Petitioner also complains about "shuffling" of the jury panel. Respondent states that shuffling is not practiced in North Carolina. Petitioner has produced no contrary evidence and no evidence to show that shuffling occurred in his case.

Petitioner argued unsuccessfully to the court of appeals that they should have been admitted as exceptions to the hearsay rule.

The statements include the one he made at the hospital that was overheard by a police officer, one he made to the nurse about the cause of his wound, and one that he made to Jeanette Florence. At trial, Petitioner's attorneys tried several times without success to have these statements introduced. Petitioner's appellate attorneys claimed that the failure to allow these statements into evidence constituted prejudicial error by the trial court, but the North Carolina Court of Appeals rejected the argument. Petitioner also unsuccessfully argued the claim in his motion for appropriate relief.

Petitioner tries to reformulate this claim as a violation of the Confrontation Clause in the United States Constitution and as a violation of due process. However, the Confrontation Clause guarantees the right to confront hostile witnesses, not to present favorable testimony, such as a defendant's own self-serving statements. See United States v. Crockett, 813 F.2d 1310, 1313 (4th Cir. 1987). Petitioner's claim is instead only an allegation that state law evidentiary rules improperly barred the admission of his statements. "Normally, the admissibility of evidence, the sufficiency of evidence, and instructions to the jury in state trials are matters of state law and procedure not involving federal constitutional issues. It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." Grundler v.

-15-

<u>State of North Carolina</u>, 283 F.2d 798, 802 (4th Cir. 1960). This holding was later reaffirmed by the Fourth Circuit in <u>Spencer v. Murray</u>, 5 F.3d 758, 762 (4th Cir. 1993).

The exclusion of Petitioner's statements did not impugn fundamental fairness. For the reasons set out in the North Carolina Court of Appeals' opinion, all of the statements were self-serving hearsay explanations made during times when Petitioner was well-aware that police were looking for him and that he was likely in trouble.[4] Also, as that court explained, the evidence against Petitioner was extremely strong.[5] The state court denials of his claims involving these statements did not run afoul of federal law in any way.

Petitioner also contends that his appellate attorneys erred by failing to properly argue his claims. However, he cannot demonstrate prejudice because nothing they did or did not do could

---

[4]The North Carolina Court of Appeals only addressed two of the three statements. It found the exclusion of the statement to Ms. Florence to be harmless error, if there were error in the exclusion.

[5]Petitioner faced an enormous, virtually unsolvable problem in trying to show his killing Ms. Gattis was accidental. This starts with the fact that he broke into her apartment, threatened to kill Stover, and shot at him. Petitioner then took the time to reload the gun, put Ms. Gattis in a headlock, threatened to kill her, refused to leave, and ignored her pleas. Under these circumstances, few, if any, people would ever consider assessing some of the blame to Ms. Gattis for her death. Nor would they consider the shooting to be accidental, when a person breaks into an apartment, holds a gun to another person's head, threatens to kill them, and the gun goes off. Reasonable people would conclude that in such a dangerous, volatile situation, the gun will be discharged. It is only a matter of time. Moreover, premeditation is not even an element of felony murder. <u>State v. Gwynn</u>, 641 S.E.2d 719 (2007). The theory of the "accidental" shooting had virtually no chance of success at the guilt stage of the trial. Its importance was in helping the plea for mercy in the penalty stage of the trial.

have changed the reality just discussed.  His entire third claim will be denied.

**Claim Four**

Petitioner's fourth claim alleges that he received ineffective assistance of counsel when his attorneys conceded his guilt during cross-examination of Claudia Smith and during opening and closing arguments in the guilt phase of his trial.  He complains that they elicited testimony from Smith that Petitioner called her on the night Ms. Gattis was killed and told her "I'm sorry. Charlotte's dead. I shot her. I killed her." (Trial Tr. at 3073.)  As for the arguments, he takes issue with the fact that his attorney stated in opening arguments that Petitioner had committed some sort of nonspecific wrongdoing and acknowledged that Petitioner shouldn't have taken the gun into the house.  (Id. at 2045.)  His attorney stated in closing arguments that Petitioner shot himself in the left hand.  (Id. at 3516.)

An examination of the challenged statements in context reveals that Petitioner's fourth claim is entirely frivolous.  First, the State's evidence was going to clearly establish the "so-called" concessions in any event.  Also, it was quite clear that a strategy of doing nothing would be dangerous.

Second, counsel's statements were not a concession of guilt.  Contrast Florida v. Nixon, 543 U.S. 175 (2004).  In Nixon, the attorney actually conceded the kidnaping and murder.  Here, counsel did no such thing.  However, in Nixon, the Supreme Court found that even the more specific concession to the actual crime charged did

-17-

not amount to a guilty plea and was not presumptively prejudicial. The Supreme Court found it reasonable, particularly where the evidence of guilt was overwhelming, to not inflame the jury by denying obvious facts in order to have a better chance of success at the penalty phase of the trial. That is what counsel did here, and successfully, since Petitioner was spared the death penalty.

Third, Petitioner knew from the beginning of his trial that his attorneys intended to argue that he had engaged in wrongdoing, but had not committed the crimes of first-degree murder or first-degree burglary. He stated on the record that this was so, that he understood the strategy, and that he supported it. (Id. at 33-34.) This eviscerates his claim because all of the statements about which he complains were clearly part of that strategy.

The statement in the opening argument was nothing more than a revelation of the overall strategy to the jury--a necessary occurrence if the strategy was to be pursued. Claudia Smith's testimony about Petitioner's statement to her indicated only that Petitioner had killed his wife. This basic fact was never in dispute. The statement in no way showed whether that killing was premeditated, deliberate, intentional, or unintentional. However, it did show that he was remorseful and perhaps that he did not plan to kill his wife at the time he went to the apartment. This was later used by his attorneys in the closing argument as a part of the previously discussed strategy. (Id. at 3529.) The same is true for the fact that Petitioner shot himself in his left hand while shooting Ms. Gattis. This was used by Petitioner's defense

-18-

attorneys as evidence that the gun went off unintentionally and without premeditation while Petitioner and Gattis were wrestling over it. (Id. at 3525-3526, 3534, 3537.) The statements Petitioner complains about not only did not prejudice him, but helped his cause to the limited extent they could in the face of the overwhelming evidence of guilt. This claim is without merit.

**Claim Five**

In his next claim, Petitioner objects to statements made by the prosecutor during opening and closing arguments. In the opening argument, the prosecutor described Petitioner as a personification of death, stating that "death came knocking on Charlotte Gattis's door." (Id. at 2033.) After an objection from defense counsel and a cautionary instruction from the trial judge that the arguments were not evidence in the case, the prosecutor continued and stated, "And death wasn't dressed as a skeleton in a black hooded robe carrying a scythe. The evidence is going to show death was Christopher Gattis, the defendant, seated in this courtroom, wearing dark clothes, carrying a screwdriver, and a 9 millimeter pistol." (Id. at 2033-2034.) At other times in the argument, he said that "[d]eath ran out the door" and that "[d]eath was dressed as Chris Gattis armed with a screwdriver to get into the apartment, and a 9 millimeter handgun to take care of business when he got there." (Id. at 2040, 2043.)

During closing arguments, the prosecutor repeated his earlier statement that death came to Ms. Gattis's door dressed as Petitioner and asked the members of the jury, "[c]an you feel death

-19-

in this courtroom?" He suggested that they had "failed miserably" if they could not. (<u>Id.</u> 3564, 3594.) He also noted that Ms. Gattis's daughter would not get to share any special moments with her mother in the future, such as talking to her about boys, getting her driver's license, buying her a present, or having her attend her graduation or wedding. (<u>Id.</u> at 3598-99.) Petitioner claims that all of these statements were improper and that his attorneys erred by failing to object to any of the statements other than the first one.

A prisoner must meet a high standard in order to succeed on a claim based on the State's arguments. He must show that the remarks either violated a specific constitutional right or "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).

Petitioner does not argue that a specific right was violated, but instead asserts a due process violation. This claim fails. There is no question that Petitioner's actions resulted in the wrongful death of Ms. Gattis and that the death deprived her daughter of her mother forever. Therefore, it is difficult to see how characterizing Petitioner as death coming to call or mentioning the impact on Ms. Gattis's daughter was unfair. Moreover, even if the comments were somewhat inflammatory, they were not so egregious as to render the entire proceeding unfair. There was an enormous amount of evidence, not the least of which was a 911 tape with Petitioner telling Ms. Gattis that he was going to kill her, and

-20-

her begging him not to kill her, all of which indicates that the killing was premeditated and intentional. Further, there was abundant evidence to allow the jury to conclude that Petitioner broke into the apartment and would not leave just prior to his killing Ms. Gattis. There is simply no realistic chance that a few isolated comments, as opposed to the mountain of evidence against Petitioner, swayed the jury to convict him of first-degree murder through both premeditation and deliberation and felony-murder.

Also, Petitioner's attorneys did not prejudice him by failing to object to all of these comments. They did object to the first "death" comment and the trial judge gave a cautionary instruction that the arguments were not evidence in the case. Making more objections would not have achieved a different result and would only have drawn further attention to the prosecutor's arguments and led to further repetition of an instruction that the jury heard at least three times in the case, twice in rapid succession at the beginning of the opening arguments. (Trial Tr. at 2033, 3484.) Plaintiff's fifth claim fails and will be denied.

### Claim Six

Petitioner's sixth claim alleges that Petitioner received ineffective assistance of counsel when his attorneys did not move to suppress his "Post Miranda Statement." The statement to which Petitioner is referring is a statement he gave to the police following his arrest. He complains that the statement should have been suppressed as invalid because he was given pain medication at the hospital while being treated for the gunshot wound to his arm,

prevented from speaking to his family while at the hospital, taken from the hospital without being read his Miranda rights, and questioned without his attorney present.

Petitioner's claim fails on its face. Contrary to his assertion, his attorneys **did** attempt to have his statement suppressed. An extensive voir dire hearing was conducted and at least the critical portions of the issues Petitioner now raises were addressed. (Id. at 3256-3281) The attorneys failed to win the objection in the end, but this does not equate to ineffective assistance. His sixth claim for relief fails and will be dismissed.

### Claim Seven

Petitioner's seventh claim for relief alleges that the trial court erroneously allowed hearsay evidence to be admitted against him, that it erroneously allowed his prior convictions to be admitted into evidence, and that his appellate attorney was ineffective in raising these points. To support his claim, Petitioner points to the testimony of several witnesses in which they revealed statements made by Ms. Gattis concerning problems (violence, infidelity, financial difficulties) in her relationship with Petitioner.

Turning first to Petitioner's allegation that his appellate attorney failed to properly raise the issue on appeal, this is both supported and defeated by the North Carolina Court of Appeals' decision in the case. It is true that the Court of Appeals did state that Petitioner's appellate counsel failed to properly identify the specific portions of any testimony which was

-22-

inadmissible, but instead cited only to the oral rulings being challenged. <u>Gattis</u>, 166 N.C. App. at 13, 601 S.E.2d at 213. However, the Court did proceed to consider the issue on the merits and determined that the statements were admissible to show Petitioner's motive in killing Ms. Gattis, show the victim's state of mind regarding her relationship with Petitioner, and refute his contention that they had an ongoing relationship. <u>Id.</u> at 13-15, 601 S.E.2d at 213-14. Therefore, while Petitioner's appellate attorney may have erred, the error did not prejudice him by precluding consideration of the argument raised.

The remainder of Petitioner's claim is a challenge to state court rulings on the admission of evidence. Again, he would need to be able to show "circumstances impugning fundamental fairness" to even present a federal question for review. He utterly fails to do so. The statements about which Petitioner complains were relevant and necessary for the reasons stated by the court of appeals. Also, they pale in comparison to the other evidence, particularly the 911 tape, showing his motivation and intent in committing the crimes charged. Therefore, anything in the hearsay statements portraying him as a bad or violent person is insignificant compared to his own words and deeds, which were recorded on the tape.

As for his challenge to the introduction of his criminal record, it centers around convictions he received for prior assaults on Ms. Gattis. In a situation where a defendant is charged with killing his or her spouse, convictions of prior

-23-

assaults may be used to establish intent, lack of accident, etc. (Trial Tr. at 3133.) In 1994, he was convicted of assault on a female and injury to personal property in cases 94 CR 18765 and 18767. In 2001, he was convicted of assault on a female in case 00 CR 61410. After a voir dire hearing, the prosecution was allowed to place Isabell Chatham, a Clerk's Office employee from Alamance County, on the witness stand to present these convictions to the jury. (Trial Tr. at 3141-46.) And, notably, she also presented a conviction Ms. Gattis received for assaulting Petitioner with a deadly weapon in case 98 CRS 24790. Therefore, the presentation was balanced.

Again, as with the hearsay statements concerning Petitioner's prior relationship with the victim, Petitioner cannot show that the introduction of these convictions were used for an improper purpose to prejudice him. There never was any question that Petitioner and his wife had a deeply troubled relationship for many years or that there was violence between them on the night she was killed. The real issues in the case were whether Petitioner unlawfully entered her apartment that night and whether he intentionally killed her. They were relevant to the extent they bore on the issue of intent and lack of accident. On the other hand, Chatham's simultaneous testimony concerning the victim's prior conviction for assaulting Petitioner actually lent credence to his story that they were fighting over the gun and it simply went off. The entire proceeding was not rendered fundamentally unfair by the

introduction of the convictions.  Petitioner's seventh claim for relief is denied.

### Claim Eight

Petitioner's eighth claim for relief alleges ineffective assistance of counsel due to the failure of his trial attorneys to request funds to hire expert witnesses to "assist the jury beyond a reasonable doubt that the victim could have contributed to the firing of the weapon." (Docket No. 1 Attachments at 17.) Petitioner's claim is conclusory and can be dismissed as such. Nickerson v. Lee, 971 F.2d 1125 (4th Cir. 1992).  Petitioner does not identify a specific expert that should have been sought or show what their testimony would have addressed.

Petitioner does claim that SBI Agent Rick Navarro "testified the victim [sic] latent prints and blood was on the barrel and grip of the weapon" and that Dr. Christopher Ingram testified that there was powder residue on the victim's hands, indicating that her hands could have been on or near the weapon when it was fired. (Docket No. 1 Attachments at 18.)  Petitioner is correct in his characterization of Dr. Ingram's testimony (Trial Tr. at 3096-97), but incorrect as to Navarro's (Id. at 2735-36).  In the passage cited to by Petitioner, Navarro testified only that he was unable to lift any usable prints from the gun and that the gun had some blood on it.  He did not state that the victim's prints or blood were on it.  Petitioner has not shown that another expert could have testified differently.  As for Ingram, his testimony was favorable to Petitioner's theory of the case and was used by

-25-

Petitioner's counsel in closing arguments as evidence that the victim did have her hands on the gun when it was fired. (Id. at 3492-93.) Nothing indicates that another expert giving redundant testimony would have helped more. Petitioner's eighth claim is denied.

## Claim Nine

Petitioner's ninth claim is similar to his eighth. He asserts that his counsel failed him because they did not seek a voir dire hearing concerning the 911 tape, did not hire an expert to explain unintelligible portions of the tape, and did not move to suppress the tape based on tampering or faulty equipment. Petitioner's claim is entirely conclusory. He does not give any reason for a voir dire hearing. Nor has he presented any evidence that an expert could have explained or deciphered the unintelligible portions of the tape, much less shown that those portions would have helped his case if they could be understood. He has also provided no basis for any allegation of tampering or equipment malfunction. His claim is denied pursuant to Nickerson, supra.

## Claim Ten

Petitioner's tenth and final claim is that his indictment was faulty because it did not allege premeditation and deliberation and felony-murder. Petitioner states that it instead alleged only second-degree murder and that the trial court was without jurisdiction to try him for first-degree murder. He is incorrect.

Petitioner's argument has been raised and rejected previously by others on many occasions. It is true that indictments in North

-26-

Carolina first-degree murder cases often do not specifically allege premeditation and deliberation or felony-murder. However, the Fourth Circuit Court of Appeals has held that these "short-form" indictments pass constitutional muster. See <u>Allen v. Lee</u>, 366 F.3d 319, 323-24 (4th Cir. 2004); <u>Hartman v. Lee</u>, 283 F.3d 190, 192 (4th Cir. 2002). The Court may not ignore this very clear precedent. Petitioner's tenth claim is also denied. Respondent's motion for summary judgment is granted.[6]

**IT IS THEREFORE ORDERED** that Respondent's motion for summary judgment (Docket No. 6) is granted, that the habeas petition (Docket No. 1) is denied, and that this action is dismissed.

_____
**United States Magistrate Judge**

June 20, 2007

---

[6]The Court has addressed all of the claims that it determined were raised in the petition in this case. However, Petitioner has submitted literally hundreds of pages of material, much of it handwritten by him and some of which has been stricken. It is arguable that a number of sections in his submissions raise, or at least touch on, possible additional claims not raised in the petition. To the extent that this may be the case, such "claims" will not be considered by the Court. All claims must be set out in the original petition. <u>United States v. Yearwood</u>, 863 F.2d 6 (4th Cir. 1988). Moreover, such claims would likely fail on their merits, but more importantly, because of Petitioner's failure to properly raise the claims in the original petition or through a timely and properly granted motion to amend, they would now likely be barred by the statute of limitations. <u>Mayle v. Felix</u>, 545 U.S. 644 (2005).